J-A03040-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| TERM. OF PAR. RIGHTS TO J.N.J.P., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: B.F., NATURAL FATHER | : : : : : : : | |
| | : | No. 1229 MDA 2020 |

Appeal from the Order Entered August 24, 2020
In the Court of Common Pleas of Huntingdon County Orphans' Court at
No(s):  OC-38-2018

BEFORE:  LAZARUS, J., KUNSELMAN, J., and MURRAY, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED FEBRUARY 25, 2021**

B.F. (Father)[1] appeals from the order, entered in the Court of Common Pleas of Huntingdon County, terminating his parental rights to his minor daughter, J.N.J.P. (Child)[2] (born 7/12).  After careful review, we affirm.

---

[1] A.S. (Mother), Child's mother, has also filed an appeal from the court's order terminating her parental rights to Child.  Mother's appeal is docketed at 1206 MDA 2020.

[2] The trial court appointed Roberta Binder Heath, Esquire, as guardian *ad litem* for Child.  Michael Kipphan, Esquire, is Child's legal counsel.  **See** 23 Pa.C.S. § 2313(a) (children have statutory right to counsel in contested involuntary termination proceedings) and **In re K.R.**, 2018 PA Super 334 (Pa. Super. filed Dec. 10, 2018) (en banc) **but see In Re: T.S., E.S.**, 2018 Pa. LEXIS 4374, 2018 WL 4001825, at *10 (Pa. filed Aug. 22, 2018) ("[D]uring contested termination-of-parental-rights proceedings, where there is no conflict between a child's legal and best interests, an attorney-guardian *ad litem* representing the child's best interests can also represent the child's legal interests.").

Child has resided with A.K. and S.K. (Foster Parents) since Child was seven weeks old. Mother asked Foster Parents to take care of Child because Mother was struggling with substance abuse. Mother presumptively believed that Z.P., Foster Parents' son, was Child's father; Z.P. and Mother were dating at the time of Child's birth.[3] DNA testing, however, later proved that B.F.[4] was Child's biological father.[5] In a separate custody action,[6] a Blair County trial judge entered an order granting sole physical custody of Child to Foster Parents and shared legal custody of Child to Foster Parents and Father on December 17, 2014. The custody order permitted Father to visit with Child every other weekend from Friday at 5:00 p.m. until Tuesday at 7:00 p.m.

On November 20, 2018, Foster Parents[7] filed petitions to involuntarily terminate Mother's and Father's parental rights to Child, with the intent to

---

[3] Z.P. is named on Child's birth certificate as his father.

[4] Father moved to Ohio in 2013-2014.

[5] According to Foster Father, B.F discovered he was Child's natural father when Child was approximately 10 months old. N.T. Termination Hearing, 7/8/19, at 121.

[6] Foster Parents filed a custody action in Blair County, seeking custody of Child, against Mother and presumptive father, Z.P. Father later intervened in the matter. N.T. Termination Hearing, 10/8/19, at 102-03. In 2018, paternal aunt filed a petition to intervene in the custody matter, alleging abuse by Foster Parents. Father's Proposed Findings of Fact and Conclusions of Law, 7/8/20, at 1. That motion to intervene was denied. On April 24, 2019, the custody case was transferred to Huntingdon County.

[7] Several court documents refer to Foster Parents as Paternal Grandparents. However, because Z.P. is not, in fact, Child's biological father, Foster Parents

- 2 -

adopt Child. **See** 23 Pa.C.S. § 2512(a)(3) (petition to terminate parental rights with respect to child under 18 may be filed by "[t]he individual having custody or standing *in loco* parentis to the child and who has filed a report of intention to adopt required by section 2531 (relating to report of intention to adopt)"); **see also** N.T. Termination Hearing, 7/8/19, at 18 (Foster Mother testifying she and Foster Father intend to file petition to adopt Child); **Id.** at 106 (Foster Father testifying to same).[8] At a termination hearing held on July 8, 2019, the court heard testimony from Foster Parents. Foster Mother testified that the last time Mother saw Child in person was in 2014; however, Foster Mother also admitted that she has been ignoring Mother's attempts to contact her and reestablish her relationship with Child, since at least October of 2018 and, possibly, as far back as 2017. **Id.** at 42-47. Foster Mother admitted that Foster Father had been convicted of the summary offenses of harassment (2017), criminal mischief (2017) and disorderly conduct (2013).[9]

---

are not Child's biological grandparents. Thus, we refer to them as Foster Parents throughout this decision.

[8] We recognize that, effective December 28, 2020, subsection 2512(b)(3) was added to section 2512 so that a parent-petitioner whose child was conceived as a result of rape or incest by the other parent no longer needs to aver that an adoption is presently contemplated or that a person with a present intention to adopt exists. **See** 23 Pa.C.S. § 2511(b)(3); **see also** Act 2020-95 (H.B. 1984), § 1, approved October 29, 2020, eff. December 28, 2020; **see also In the Interest of Z.E.**, 221 A.3d 260 (Pa. Super. 2019) (memorandum per curiam) (non-precedential decision).

[9] Foster Mother also testified that there has been no finding against her or her husband by Huntingdon County Children and Youth Services Agency (CYS).

*Id.* at 61-62.  Finally, Foster Mother testified that Father had been sending $24/week in court-ordered child support for Child since 2016 or 2017.  *Id.* at 85.

On October 8, 2019, Mother and Paternal Grandmother testified at a second termination hearing.  In October of 2018, Mother filed a *pro se* custody petition to modify custody in Blair County; the petition was pending at the time of the termination hearing.  On November 25, 2019, Mother filed a motion to produce records from Blair County Children and Youth Services Agency and Huntingdon County Children and Youth Services Agency regarding Foster Mother.

In the wake of the COVID-19 pandemic, the court scheduled a videoconference termination hearing which was held on May 28, 2020.  Father and Foster Parents testified at that hearing.[10]  At the hearing, Mother's counsel brought forth records from Huntingdon County Children and Youth Services (CYS) indicating that CYS had referred services to Foster Mother for parent substance abuse, inappropriate discipline and mental health concerns.  N.T. Videoconference Termination Hearing, 5/28/20, at 53.  Counsel and the court noted that there was no record of a dependency matter ever having been filed with regard to Child and Foster Parents.  *Id.* at 56.  Foster Mother denied any

_____

N.T. Termination Hearing, 7/8/19, at 13-14.  However, this testimony was challenged at a later termination hearing when Mother recalled Foster Parents to the stand to testify.

[10] Mother recalled Foster Parents at this hearing.  *See supra* at n.9.

of the incidents alleged in those records, specifically denying that she had any substance abuse issues or that she had ever been admitted to an inpatient rehabilitation facility. *Id.* at 57.

Mother rebutted Foster Mother's denials with a 2012 consent agreement Foster Mother had entered into with the Pennsylvania Bureau of Profession and Occupational Affairs stating that Foster Mother does not deny her addiction (alcohol dependence disorder), that she welcomes the opportunity to continue her recovery under the supervision of the State Board of Nursing, and that Foster Mother's nursing license was indefinitely suspended for no less than three years, but that the suspension was immediately stayed in favor of no less than three years of probation, subject to terms including receiving treatment for her addiction. *Id.* at 57-60. Mother introduced evidence that Foster Mother violated her probation by failing to submit to alcohol testing and, thus, the stay was lifted and her license was indefinitely suspended for no less than three years. *Id.* at 63-64. Foster Father testified at the hearing that in August of 2019, he had been charged with Driving While Intoxicated and was later accepted into ARD.

Father testified at the hearing that he voluntarily took a job in 2014 with a traveling carnival, did not notify Foster Parents that he would be leaving the area, and did not make any attempts to see Child for over two years. *Id.* at 27, 29. Father was homeless for a portion of those two years and also lived in Ohio for some of that time. *Id.* at 30-31. Paternal Grandmother testified that she and her daughter, Child's paternal aunt, not Father, sent Child gifts

for her birthdays and holidays, as well as clothing and toys. *See* N.T. Termination Hearing, 10/8/19, at 136; *see also* Videoconference Termination Hearing, 5/28/20, at 29 (Father testifying, "I knew [my mom] was sending Christmas presents for [Child] every year."). Foster Mother testified that she gave Child those gifts, but did not tell Child who they were from. Father testified that he sent Foster Parents text messages in 2016 requesting Facebook or Skype contact with Child, but to the best of his recollection he did not receive a reply. *Id.* at 38. Father also testified that in February 2018, he asked Foster Mother if Child could visit him to celebrate [Child's] half-brother's birthday, but Foster Mother told him they had other plans at that time. *Id.* at 39.

Following the hearing, the court ordered the parties to submit proposed findings of fact and conclusions of law by July 10, 2020. On June 5, 2020, Child's attorney filed a statement indicating that he had met twice with Child and "[b]ased upon [his] interviews of [C]hild, it is [his] position that [Child] does not know who [Mother] and [Father] are." Statement Pursuant to Directive of the Court, 6/5/20, at 1. Additionally, counsel stated that after observing Foster Mother and Child, they "show a well[-]bonded 'parent'[-]child relationship . . . [and that Child] states that [Foster Mother] is [Child's] mother." *Id.* at 2. On August 24, 2020, the trial court granted Foster Parents' petitions and involuntarily terminated Mother's and Father's parental rights to

Child pursuant to sections 2511(a)(1) and (b) of the Adoption Act.[11]  Father

filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise

statement of errors complained of on appeal.  Father presents the following

issues for our consideration:

> (1) Whether the trial court abused its discretion in finding that [] Father's parental rights should be involuntarily terminated because he took all steps available to him to communicate an[d] develop a relationship with [Child] which were nullified by the obstructive tactics of [Foster] Parents.
>
> (2) Whether, alternatively, even if [] Father has failed to perform his parental duties or established a settled purpose of relinquishment of his rights, termination is not appropriate because it is not in the best interest of [Child's] "developmental, physical[,] and emotional needs."

Father's Brief, at 2.

We review a trial court's decision to involuntarily terminate parental

rights for an abuse of discretion or error of law.  *In re A.R.*, 837 A.2d 560,

563 (Pa. Super. 2003).  Our scope of review is limited to determining whether

the trial court's order is supported by competent evidence.  *Id.*

> In a proceeding to terminate parental rights involuntarily, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.  The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well[=] established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in

---

[11] 23 Pa.C.S. §§ 2101-2938.

light of the totality of the circumstances clearly warrants termination.

**In re Adoption of S.M.**, 816 A.2d 1117, 1122 (Pa. Super. 2003) (citation omitted). **See also In re C.P.**, 901 A.2d 516, 520 (Pa. Super. 2006) (party seeking termination of parental rights bears burden of proving by clear and convincing evidence that at least one of eight grounds for termination under 23 Pa.C.S. § 2511(a) exists and that termination promotes emotional needs and welfare of child set forth in 23 Pa.C.S. § 2511(b)).

In his first issue on appeal, Father contends that the trial court erred in terminating his parental rights where he took all steps available to him to communicate with Child, but Foster Parents used "obstructive actions" to prevent him from "calling, messaging, FaceTiming, or in any other way communicating with [Child]." Father's Brief, at 14. Father also avers that Foster Parents "blocked him by phone and social media [and did not tell Child] she was receiving gifts from [Father]." **Id.**

It has been established that "if the failure to perform parental duties results from obstructive tactics, such failure is excused." **In re Baby Boy H.**, 585 A.2d 1054, 1056 (Pa. Super. 1991) (citation omitted). However, in **In re Adoption by Shives**, 525 A.2d 801 (Pa. Super. 1987), our Court noted:

> The law recognizes . . . that there are situations in which a custodial parent has deliberately created obstacles and has[,] by devious means[,] erected barriers intended to impede free communication and regular association between a noncustodial parent and his or her child. Therefore, it is incumbent upon a court, before it terminates the rights of a noncustodial parent, to consider carefully the noncustodial parent's explanation, if any, for his or her apparent neglect. Only where the totality of the

- 8 -

circumstances demonstrates clearly and convincingly that a parent has refused or failed to perform parental duties for a minimum period of six months may an order be entered terminating parental rights. ***In re Santelia***, 465 A.2d 21, 23 ([Pa. Super.] 1983). **The pertinent inquiry is not the degree of success a parent may have had in reaching the child, but whether, under the circumstances, the parent has utilized all available resources to preserve the parent-child relationship.** ***In re Adoption of Faith M.***, [] 501 A.2d [1105,] 1108 [Pa. (1984)].

***Id.*** at 803 (emphasis added).

Instantly, the trial court terminated Father's parental rights under section 2511(a)(1), which states:

> (a)    General rule. — The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S. § 2511(a)(1). Under section 2511(a)(1), however, a trial court should also consider the entire background of the case and not simply

> mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his [or her] . . . parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

***In re B., N.M.***, 856 A.2d 847, 855 (Pa. Super. 2004).

Here, Father claims that he used all available resources to maintain a relationship with Child, including sending [Child] cards, gifts, and electronic and mail messages. He also states that he believed Foster Parents were giving

these gifts and relaying these messages to Child. However, during the termination proceedings, Father claims he found out for the first time that Foster Parents were thwarting his communication efforts. Further, Father contends that not only does he faithfully pay monthly child support, but he has repeatedly, and unsuccessfully, requested to visit with Child.

In its memorandum accompanying the termination order, the trial court supported its decision to terminate Father's parental rights as follows:

> [T]he issue is whether these parents or either of them have failed to perform parental duties with respect to [Child]. Ha[s] either affirmatively demonstrated parental devotion to and extended themselves to maintain a place of importance in the life of [Child]. The answer[] to these questions is unequivocal. Neither parent did anything to establish a relationship with [Child] until years after their separation from [Child]. In this case[,] the factor that is egregious is that at all times[,] each parent had a remedy to assert their right as a parent since each is a defendant in an open custody action concerning [Child] and each could have at any time returned to court to claim their right to a relationship with [Child]. [Father] has the benefit of a court order awarding him [shared] legal . . . custody of his daughter and yet, no affirmative action was taken [by either parent in that case] until October [] 2018, when [Mother filed] a [*pro se*] petition to modify. . . . [Foster Parents] have at all times been the parents of [Child] and no evidence suggested that they have failed in any way to provide [Child with] the "love, protection, guidance[,] and support" [Child] needs and deserves. [Foster Parents] have been and are [Child's] parents. Therefore we will grant their petitions.

Memorandum, 8/24/20, at 22-23. In its Rule 1925(a) opinion, the court further explained its reasons for terminating Mother's and Father's parental rights to Child:

> In this case[,] the evidence was unequivocal that each parent elected to absent themselves form the life of [Child] since 2012 in the case of [Mother] and since 2015 in the case of [Father]. At

- 10 -

all times[,] either could have sought assistance from the Blair County Court of Common Pleas to assist in establishing a relationship with [Child], but it was not until October 2018 that [Mother] sought help. In our view, this delay defeats any argument that [Foster Parents] bear responsibility for the fact that there is no relationship between [Child] and her natural parents. Their conduct is the reason their parental rights were terminated.

Rule 1925(a) Opinion, 10/6/20, at 3. We agree with the trial court that Father's efforts were too little too late.

Father testified that even though the court had granted him visitation every other weekend, he voluntarily took a job in 2014 with a traveling carnival, did not notify Foster Parents that he would be leaving the area, and did not make any attempts to see Child for over two years. N.T. Videoconference Termination Hearing, 5/28/20, at 27, 29. Father was homeless for a portion of those two years and also lived in Ohio for some of that time. *Id.* at 30-31. In addition, Father never filed a petition to modify custody to protect or expand his custodial rights to Child. *Id.* at 27-28, 32. Foster Mother testified that she gave Child gifts, but did not tell Child who they were from. However, Paternal Grandmother testified that she and her daughter, Child's paternal aunt, sent Child gifts for her birthdays and holidays, as well as clothing and toys. N.T. Termination Hearing, 10/8/19, at 136. The actions of Father's mother and Father's sister do not relieve Father from his parental responsibilities. N.T. Videoconference Termination Hearing, 5/28/20, at 29 (Father testifying, "I knew [my mom] was sending Christmas presents for [Child] every year."). Father testified that he sent Foster Parents text messages in 2016 requesting Facebook or Skype contact with Child, but to

the best of his recollection he did not receive a reply. *Id.* at 38. Father also testified that in February 2018, he asked Foster Mother if Child could visit him to celebrate [Child's] half-brother's birthday, but Foster Mother told him they had other plans at that time. *Id.* at 39.

Based on the evidence of record, we find that the court properly terminated Father's rights under section 2511(a)(1). Even if Foster Parents made it difficult for Father to contact or see Child, under the circumstances, Father clearly did not utilize all available resources to preserve his parent-child relationship where, for the better part of two years, he did not even attempt to see Child. *In re Adoption by Shives*, *supra*. *See In re Baby Boy H.*, *supra* at 1056 ("To obtain the benefit of this excuse, a parent must exhibit reasonable firmness in attempting to overcome the obstructive behavior.").

In his final issue on appeal, Father contends that termination is not appropriate because it is not in the best interest of Child's "developmental, physical[,] and emotional needs." Father's Brief, at 2.

Only after a court determines that the party seeking termination has proven by clear and convincing evidence that the parent's conduct satisfies termination under section 2511(a), may the court then engage in the second part of a termination analysis under section 2511(b)—determination of the needs and welfare of the child under the standard of best interests of the child. *In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007). Pursuant to section 2511(b):

(b) Other considerations. — The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b). The focus under section 2511(b) is not on the parent, but on the child. *In re Adoption of R.J.S.*, 901 A.2d 502, 514 (Pa. Super. 2006). This Court has explained that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into [the] needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005). The trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* The trial court "must examine the status of the bond to determine whether its termination would destroy an existing, necessary[,] and beneficial relationship." *Id.* (internal quotation marks and citation omitted). Further, "[c]ommon sense dictates that courts considering termination must also consider whether [a Child is] in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d 251, 268 (Pa. 2013).

Instantly, Father testified that he could only "hope" that Child would recognize him if Child saw him at the time of the termination hearing in May 2020. N.T. Videoconference Termination Hearing, 5/28/20, at 40. Moreover, Child's guardian *ad litem* averred in an affidavit that Child is well bonded with

Foster Parents and does not know Mother and Father as her parents. Child's guardian *ad litem* opined that it is in Child's best interest to remain with Foster Parents and to terminate Mother's and Father's parental rights to Child. Finally, as stated earlier, Child's attorney interviewed Child twice and noted that Child is well-bonded to Foster Parents and does not know who Father is. Statement Pursuant to Directive of the Court, 6/5/20, at 1-2.

Here, no parent-child bond was demonstrated. In fact, Child's guardian *ad litem* and attorney both observed that Child has a well-established bond with Foster Parents and considers them to be her natural parents. Under such circumstances, we believe that terminating Father's rights to Child best serves Child's "developmental, physical, and emotional needs" where Father has failed to meet Child's needs and welfare almost her entire life. 23 Pa.C.S. § 2511(b). Thus, we find no merit to this final issue on appeal.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 02/25/2021

- 14 -